Howry, J.,
delivered the opinion of the court:
This action arises from a contract for the construction of a lock pit for a new lock at St. Marys Falls Canal in the State of Michigan, for the recovery of $101,110.51 as damages for alleged breaches by the defendants of the agreement, and for extra services undertaken and performed and expenses incurred by plaintiffs, either at the instance of the defendants or because of the breaches alleged, whereby plaintiffs were obliged to perform the services and incur said expenses to carry out the contract. The defendants deny the grounds of action aside from retained percentages and some few items, and allege loss and damage to them arising from" breaches of the contract on the part of the plaintiffs, and plead counterclaims amounting to $89,159.50, asserting a general balance due the United States on a full statement of the account of $02,784.43, for which amount judgment is asked against the plaintiffs.
The case is before us by reference from the War Department under the provisions of section 1063 of the Revised Statutes.
The facts pertaining to the several items vary so greatly that they present several distinct causes of action, which is likewise true with respect to the items of the counterclaim. The demands of the plaintiffs are necessary to be considered with those of the defendants as the determination of the claims of the one party will have the effect of disposing of the claims of the other.
The contract and the specifications are set out in full in the findings. By these it appears a great public improvement involving the expenditure of a large sum of money was provided for, rendering necessary the investment of a large sum of money in the plant, appliances, and material, and in the employment of the necessary labor to do the work on the part of the contractors.
*320 The first subject of contention is the demand of the contractors for the excavation of 9,262.33 cubic yards of rock at $1.33 per cubic yard, aggregating $12,317.90. This charge is made up by taking the amount of 3,262.58 cubic yards of rock excavation within the slopes and above grade and adding thereto the amount of 5,999.75 cubic yards of rock excavation below grade, the latter amount having been recommended by the defendant’s engineer, who allowed for rock excavated to a depth of 11¿ inches below grade. The recommendation being-rejected, the item must be considered on its merits.
The i>rincipal item of the counterclaim arises on the provision relating to the excavation of rock. This part of the cross action is a charge against the contractors for the cost to the United States in excavating rock alleged to have been shattered by the contractors below the grade and of replacing the same with concrete, which the defendants say amounts to $82,502.04. The issues on these respective demands present wide differences of much import and gravity.
By the contract the plaintiffs agreed to excavate and remove 108,000 cubic yards, more or less, of rock, bank measurement, at the rate of $1.33 per cubic yard. Under the head of “Excavation ” the specification provides that—
“ The lock pit must be excavated to the width and length and depth which the engineer in charge sliall deem necessary. * * * For this work the contractor will be paid by the cubic yard, measured in the bank. Care must be taken to leave the rock in the bottom of the completed pit undisturbed, and it must be dressed in a suitable manner to receive the timber and masonry of the lock. For such dressing the contractor will receive no extra compensation, and should he, by accident or otherwise, shatter the rock intended to be left undisturbed, he will be required to remove the shattered portions and replace them with masonry or concrete, all at his own expense, and subject to the approval of the engineer in charge.”
It is contended that this provision does not carry with it any responsibility to pay the contractors for rock excavated below grade, and if any such excavation was made the grade should be restored to its proper limit and concreted at the cost of the contractors. This defense rests.upon the charge that in blasting the rock of the pit necessary to be excavated the contractors negligently and carelessly used excessive charges of powder and shattered and broke the bed rock of *321 the pit below tbe grade as fixed by the engineer in charge of the work, contrary to the provisions of the contract in that they failed and neglected either to remove the rock thus shattered and broken or to replace it with concrete or masonry. This, the defendants say, necessitated the subsequent employment of their own force or subsequent contractors at defendants’ cost to move the shattered rock below grade and replace the same with concrete, the cost of which became a charge against the contractors.
Aside from the charge of negligence and carelessness and the liability of the contractors to replace the excavated pit with concrete, the defendants further insist that upon any excavation below grade, for any cause whatever, the contractors can not recover.
This offset is not sustained by the findings. The excavation below grade was not the result of excessive charges of explosives, and the allegation of negligence and carelessness on the part of the contractors in the work of excavation is not made out. The contractors were without fault. In the final estimate of the amount due them the engineer supervising the work for the defendants allowed for excavating to a certain limit below grade. There were differences between the engineer and the assistant engineers as to the extent of the excavation and in the amount of the. allowance, but their reports and recommendations will not be noticed any further than to say that if the recommendation of the chief engineer should be followed plaintiffs would receive greater benefit than we find on the whole proof they are entitled to have; and while it is true the recommendations of the engineer and agents of the Government in the premises do not bind the United States, the reports of the engineer and his assistants emphasize the correctness of the findings which exclude any imputation of fault on the part of the contractors in excavating below grade, and which allow them fair compensation for such' material as they actually did take out.
There was a seeming necessity in the opinion of the engineer for carrying the excavation below grade owing to the friable nature of the strata and what the engineer styled the bad character of the stone at the bottom of the lock pit. The strata of rock dipped to the southwest, and the ledges not being horizontal and some of them soft and friable, the contractors were *322 ordered, to remove rock until better strata were found. The work done under the order below grade was in excess of the 108,000 cubic yards of excavation estimated to the grade limit first fixed by- the engineers. In point of fact, no necessity really existed for excavating below grade, as, when the entire excavation had been made, a more secure foundation was not found. The pit at grade, it turned out, was as solid and in as good a condition to receive the timber and masonry of the lock (the contractors having dressed it) as the bottom below grade was found to be after the excavation.
In any event, if any necessity existed for an excavation below grade, that necessity did not arise from any conduct of the contractors. The work of excavation within grade had been completed and the pit, then in proper condition to receive the timber and masonry, had been turned over. It is true that no formal acceptance of the work was made, but without rejecting the same or giving notice of its not having been completed according to contract, the engineers commenced experimenting with the foundation, using the force of the contractors in blasting the bottom of the pit and removing quantities of stone. The contractors were subsequently ordered to work over this foundation and to excavate more of the stone. It does not appear that any other or further dressing beyond that given the crests at grade was necessary to receive the timber and masonry of the lock.
The contract contemplated no disturbance of the rock in the bottom of the pit. The agreement was framed on the idea that no necessity would exist to go below the grade. It imposed upon the contractors the obligation not to excavate below grade without directions, but if the rock intended to be left undisturbed should be shattered through design or accident on their part they were required to remove the shattered portions and replace these portions with masonry at their own expense. Thus the defendants secured themselves against any intentional or improvident excavation on the part of the contractors. It was the bottom of the pit within grade that was not to be disturbed, and which, on completion, was to be dressed if the excavation of about 108,000 cubic yards of stone left the bottom of this pit within the grade. Plaintiffs contracted with reference to the intention not to excavate below grade through fault of their own, and to bear the consequences if they did do so. *323 But the defendants, notwithstanding the number of cubic yards estimated by the specifications, provided that any portion of the solid rock outside of the face stones of the proposed masonry might be retained undisturbed in place, diminishing to that extent the estimated amount of rock excavation and the expense of excavating any unnecessary amount, at the option of their engineers.
On the other hand, it was provided that the lock pit should be excavated to the width, length, and depth deemed necessary by the engineer to put in the foundations and walls of the proposed lock. The excavation below grade was accordingly made in compliance with the direction of the defendants’ engineer in excess of the 108,000 cubic yards contracted for, but not until the pit had been completed within grade, was in condition to receive the masonry and had been turned over to the engineer. With the excavation of 108,000 cubic yards of rock, more or less, bank measurement, the contractors became entitled to be paid the full contract price for that amount of material, if there was no disturbance of the rock in the bottom of the completed pit and this unbroken rock was suitably dressed to receive the timber and masonry of the lock. When the engineer excavated below grade to get a more satisfactory bottom, using the force of the contractors for that purpose, and removed quantities of stone from the bottom of the completed pit, the contractors were under no obligation to fill up or dress the excavated pit anew at their own expense, nor were they under obligation, free of cost to the defendants, to excavate below grade to procure a more satisfactory foundation. The provision which authorized the engineer to determine the width, length, and depth of the pit to put in the foundations and walls of the proposed lock is in the specifications, but this was not meant to compel the contractors to excavate within slopes and above grade at the price fixed by the contract and excavate without price at all below grade as far as the engineer saw fit to order them to go. It would be unreasonable to prohibit the contractors from excavating below grade and to impose penalties for their carelessness in doing so, and at the same time deny to them, without fault on their part in the matter of the, excavation, the right to compensation for obeying an order of the engineer involving the same or greater labor and cost to them in removing similar material below grade as that above grade in the face of the *324 evident intent that there was to be no excavation below grade at all. It would be still more unreasonable in such case, unless they were at fault, to require them to restore the grade at their expense. The grade that was to be restored at their cost was over such excavation that they should make by drilling too deep or blasting too much and the like, and not such excavation as the defendants ordered to be made after the pit had been completed at grade and was already in position to receive the timber and masonry of the lock. The Government acquired no right when the pit was excavated as contemplated by the contract to compel the contractors to perform work below the grade in such manner as necessarily involved them in loss.
It is contended for the defendants that because there was no reservation or exception made concerning the character of the rock below grade the same legal proposition is presented in this case as in Simpson v. The United States (31 O. Cls. B., 217; Í72 U. S. B., 372). That was a case where under the contract the obligation was imposed upon a contractor to construct a certain dock according to specifications within a designated time for an agreed price upon a site selected by the United States. The court held that there was no warranty in favor of the contractor concerning the character of the underlying soil sufficient to sustain the contention of such warranty, and although the specifications contained a statement that the dock was to be built upon an “ available site, that word did not intrinsically imply any such warranty. The contract there required the contractor to construct a completed dock, ready to receive vessels as a dry dock, and to do ail necessary work and furnish all materials at a round sum. The defendants did not expect or promise to pay for a completed dry dock beyond the agreed price; the contractor did not intend to exact or receive pay in excess of the contract, as evidenced by their conduct. There was no fact arising in the course of construction from which an agreement to pay could be presumed, and not only was none of the extra work ordered by the defendants, but there was no change of plan. The case here is different. The contract contemplated a completed pit within grade; the number of cubic yards of rock required to be excavated had been taken out and removed; the pit had been suitably dressed to receive the- timber and masonry of the lock and was in possession of the engineer. The result of the *325 excavation below the grade established the fact that the additional depth was not needed to obtain a better foundation than that obtained at grade, and the experiment of the engineer in ordering further excavations and making some of them himself can not be charged to the contractors. No request was made of the contractors to restore the grade with concrete or otherwise. On the contrary, they were ordered to quit work. In such case no damages can be recovered on a counterclaim, the contractors not being in default when ordered to suspend work. (Nourse v. United, States', 25 C. Oís. R., 8.)
A different question might arise as to the obligation of the contractors to restore the grade from the final excavations under different circumstances, but under the facts here that question does not arise.
On this demand plaintiffs are entitled to recover $8,507.45.
The retained percentages amount to $21,414.79. There is no substantial dispute over this item.
The next subject of contention arises upon a claim for $49,451.67, growing out of an order suspending the work of the contractors for the time set forth in the findings. This sum is made up of losses alleged to be sustained by the contractors and gains prevented to them whereby they were compelled to take out much of the earth (provided by the contract to be taken out) by hand, in winter, instead of with a steam shovel or excavator before frost, as they could and would have done if not hindered and delayed by the defendants. On this head the specifications provide in regulating the work that—
“The contractor will be permitted to do such portion of the work as he may desire before the cofferdam is closed. For this purpose an opening will be left in the lower part of the cofferdam of sufficient size to admit the passage of a dredge. Whenever the contractor notifies the engineer in charge in writing that he is ready to begin the dry excavation the L nited States will close the cofferdam and pump out the lock pit. The time occupied by the United States in doing this will be added to the contractor’s time for completing the work.”
By the contract, any changes or modifications in the project involving a change in the specifications as to character and quantity of labor and material as would increase or diminish the cost of the work was to be agreed upon by the parties in writing, with the reason for such change, and showing the quantities and prices of both material and labor thus substi *326 tuted for those things named in the original contract, subject to approval by the Secretary of War; and extra work or material not expressly bargained for, it was further provided, should not be claimed unless such extra work or materials were expressed in writing by the defendants and prices and quantities first agreed upon and approved by the Chief of Engineers.
This item of the claim is not for labor growing out of any change or modification involving change in the specifications as to character and quantity. It is a claim dehors the contract upon a quantum meruit for such an interference with the work as caused loss and damage to plaintiffs while they were carrying out their part of the contract. They were removing earth at the rate of 1,000 cubic yards per day when they were obliged to discontinue this earth excavation with a steam shovel or excavator for such an indefinite period as to cause them loss. Their plant was in full and successful operation with a full complement of operatives when the order came to them to cease the further prosecution of the work with the steam shovel. The indefiniteness of the time stated in the order of suspension, though creating an additional hardship upon the contractors, did not relieve them from obeying. Had they continued the work of excavation with the steam excavator in the face of the direction to suspend they would have been in direct disobedience of the terms of the contract which required them to work under the direction of the defendantsengineers. The cause of the interference is set forth in an official report of the officers in charge of said work, dated April 16,1892, to the Chief of Engineers of the United States Army. This report alleges as a reason for the interference that the instructions to discontinue the work were given because of the condition of the cofferdam, which was then considered dangerous; and the object was to retain the upper gates of the lock of 1885 to serve as a dam in case the cofferdam should give way.
The direction to resume the work was given so as to require plaintiffs to proceed September 23, after the order to suspend in July. Cold weather had set in and the ground was frozen so that the steam shovel could not be used on the interdicted area. The contractors, however, protested, but undertook to do the work, as shown by the findings.
It is contended for the defendants that when the interference became effective the contractors should have treated the con *327 tract as at an end, or have entered into a written agreement with the defendants for the increased cost of the work, or have completed the work notwithstanding the breach.-
Without reviewing the many authorities cited in support of these propositions, many of which apply in case of changes of plan only, we think the contractors are entitled to recover the fair value of their services as upon an implied contract for a quantum meruit on account of this interference with them in the prosecution of their work.
It is well settled that for any improper interference with the work of a contractor the United States,, like individuals, are liable (United States v. Smith, 94 U. S. R., 214; Clarice v. The United States, 6 Wall., 546); and the principles which govern inquiries as to the conduct of individuals in respect to their contracts are equally applicable where the United States are a party (Smoot's Case, 15 Wall., 47; 17 ib., 592); and suspension ■ of work by contractors and subsequently resuming it where the Government suspended work under a contract gives the contractors the right to recover actual damages including the loss occasioned by the non employment of hands (Figh v. The United States, 8 O. Cls. R., 320); and if by the fault of the defendants the cost of the work or the materials has been increased to that extent the jury will be warranted in departing from the contract price (Dermott v. Jones, 2 Wall., 1); and when a party injured by the stoppage of work elects to rescind he can not recover any damages for a breach either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a quantum meruit. There is then no question of losses or profits. But when he elects to go for damages for tlxe breach of the contract the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services. (Kelly v. The United States, 31 C. Cls. R., 361; United States v. Behan, 18 O. Gis. R., 687; 110 U. S. R., 338,345.)
The order of suspension only prevented the contractors from using the steam shovel. There was nothing in the prohibitory order to prevent them from removing the piers, pier fillings, lock gates, and masonry. Under any circumstances the material outside of the earth could only be removed by hand, without any addition to the cost in September over the actual cost of doing so in July. The steam excavator was used exclusively *328 in the removal of soft earth. The facts establish damages to the plaintiff's on account of the interference with the work at $9,547.40. This amount includes reasonable profits.
Damages are claimed in the fourth place, arising out of leak in the cofferdam, as follows: For extra cost of labor in cleaning plant, $1,229.45; for cost of repairs to plant, $993.15; for extra material used in repairing damages and for parts of plant destroyed, $4,257.76, and labor and material furnished the United States, $306.69.
By the contract, under the head of “Responsibility,” it was agreed:
“The United States will not be responsible for the safety of employees, plant, or material used by the contractor, nor for any other cause whatsoever, the failure of the cofferdam excepted.”
By reason of no unusual quantity of water, freshet, or other unlooked-for cause, the cofferdam leaked so as to interfere with the contractors at various times during the progress of their work, and on several occasions the leaks were of such magnitude as to require an entire cessation of the work. While the contractors had in the lock-pit area their steam and electrical plants and a large stock of appliances, fittings, tools, and materials, which they were obliged to have there, the defendants permitted the cofferdam to break and flood the lock pit with water and mud and other sediment, which was permitted to remain in the lock pit, and which submerged the machinery, fittings, tools, and appliances, to the damage of the plaintiffs, as shown by the findings.
The defendants concede that if the obligations of the contract impose liability on them in this behalf at all that the damages made out are as set forth in the findings.
The fact that the leaks in the cofferdam occurred during a period of extension of the contract at the request of the contractors, and that the repairs to the dam became a charge to the United States, does not relieve the defendants from liability on account of these damages, The items of damage on this part of the case aggregate $2,342.49.
The fifth cause of action is a claim for $3,461.99 for excavating washed-in material, the charge being that the earth was washed into the area to be excavated by reason of the break in the dam. The excavation of this washed-in material was the *329 direct result of the break in the dam and the flooding of the area of the lock pit. The presence of the mud, sand, and other sediment prevented any prosecution of the work until it was removed from the area of the lock pit. The officers and agents of the United States in charge of the work instructed the plaintiffs to remove this material. It was deposited within the rock plane, but was not rock, and it would be going too far to estimate for the removal of this sediment at rock prices. The defendants concede 50 cents per cubic yard to be the reasonable worth of this labor, and the concession is adopted. This item, therefore, amounts to $1,301.50.
The sixth cause of contention grows out of an item for pumping, for which plaintiffs ask $3,499.99. The contract provides that—
“The pumping required to sufficiently free the lock pit from water will be done by the United States. For this purpose the engineer in charge will locate the position and determine the dimensions of all necessary wells, reservoirs, and draining ditches, whereupon it will be the duty of the contractors to excavate them. This excavation, when in material in situ, will be paid for as part of the excavation of the lock pit.”
The differences between the parties grew out of the unwillingness of the engineer to locate more than one well and out of his locating that well in a place substantially inaccessible.
The contention for the United States that where an instrument provides that one party shall have power to do things which are necessary to the accomplishment of a given object, the degree of necessity for the accomplishment of this object is a thing to be determined by the party himself and his decision upon that necessity can not be reviewed by the courts, can not apply under the terms of this contract and the action of the engineer officer thereunder in relation to the pumping. If the engineer in charge had the sole right to determine the necessity for a given drain or well, whose judgment when exercised could not be the subject of review, then the one party has retained, and the other party has conceded, in the matter of the location of the wells and drains, the right of the one to exercise an arbitrary discretion to'the prejudice of the other and regardless of the effect upon the rights of the other. That we do not think was done under this contract, which contains mutual and dependent covenants.
*330 That more than one well, reservoir, and drain was to be constructed is apparent from the specifications. Nevertheless, the engineer in charge located bnt one well and directed the construction of drains with reference to but one well.
And this one well was located 300 feet east of the east end of the lock pit and the contractors were required to dig a ditch the entire length of the pit to the well in order to drain the lock pit. This would have required a ditch some 50 feet deep most of the distance and about half of it through rock. To have thus constructed a drain through material of that character for something like 1,100 feet would have required as much time as it would to have excavated the whole lock pit, and even if excavated as ordered it would have been impossible to have kept such a ditch (running the whole distance through the lock pit) open so as to carry water to the well. Under other provisions of the contract plaintiffs were under the necessity to remove material in the lock pit, and it would have imposed upon them the additional unnecessary burden to require them to dig a ditch of the depth and dimensions mentioned and at the same time compelled them to remove the additional material. The location of one well at the place indicated by the findings was the practical annulment of the contract to locate the necessary number.
Several well-considered authorities are suggested which in effect hold that in cases like this a reasonable number of wells at reasonable and convenient places are necessary so as not to impose unnecessary costs and burdens upon the other party to the contract, {dialeraft v. Louisville By. Go., 113 Ill., 885 LforJi Hampton Go. v. La Fayette College, 45 Leg. Int. (Pa.) 246; Detroit, etc., B. B. Go. v. Detroit {Mich.), 46 N. W. Bep., 12.)
Under any view that may be taken of the matter it was the duty of the defendants to locate a reasonable number of wells— how many we can not undertake to say — but certainly more than one well. The defendants having failed to do so, and the contractors being obliged to do the necessary pumping at a cost to them of $3,499.97, we think this item should be allowed.
The next item claimed is $200 on account of damages from leak in the cofferdam. This item stands upon the same footing as the fourth item and is allowed for the reasons set forth in the findings.
*331 The eighth and last item in the claim is for the balance alleged to be dne for what is known in the contract and specifications as the Fort Brady Fill, the charge for the balance claimed being $3,967.99,
The contract provides:
“All materials furnished and work done under this contract shall, before accepted, be subject to a rigid inspection by an engineer appointed on the part of the Government, and such as do not conform to the specifications set forth in this contract shall be rejected. The decision of the engineer officer in charged as to quality and quantity shall be final.”
The engineer decided adversely to the contractors on this item, which decision must stand unless impeached for fraud or mistake other than an error of judgment.
If the contract contained nothing else respecting the materials furnished and work done under the contract in filling this pier the contractors might be without remedy in this court. But the clause respecting the final decision of the engineer is not all.
The specifications provide:
“ The contractor will be required to place back of the pier to be built in front of Fort Brady 100,000 cubic yards of the excavated material,‘more or less. For a distance of 25 feet back of the pier the material must be rock. The remainder of the filling may consist of any of the excavated material except timber. The entire area between the pier and the bluff on the shore (having an average width of 100 yards) must be filled to the level of tlie top of the pier and surface to be leveled off neat and smooth. The space under the present Government dock also to be filled; for this purpose the planking will be removed by the United States. The contractor will be allowed to put in place such portions of the filling as he may desire before the pier is completed, provided that no part of such filling is placed less than 50 feet from the pier site. For the whole of this work the contractors will be paid by the cubic yard, measured in the bank after the filling material has been deposited back of the pier. * * * No payment will be made to the contractor for the removal of any ice or snow that may form or be deposited within the area referred to in these specifications.”
The differences between the parties on this item relate to the time when the estimates of the filling should have been made and the effect of the decision of the engineer of the defendants as to the manner of the filling. The engineer claimed *332 that under the contract he was not required to measure the fill until it had done settling, in consequence of which he refused to measure it until about June 5, 1891, while the contractors claimed that the fill was completed according to contract in the preceding February, at which time the engineer was requested to make the measurement; that the fill was refilled under the direction of the engineer in March, April, and May, 1891, and its measurement requested by the contractors at each time, but these several requests were refused by the engineer on the ground that the earth had not fully settled.
The defendants concede 4,777.3 cubic yards not paid for, amounting to $621.05, according to the measurement made by the engineer under the contract in June, 1891, but they say that the cost of filling 7,000 cubic yards behind the pier at 35 cents per cubic yard, amounting to $2,450, constitutes an offset for what the contractors failed to do and perform in this behalf.
If the engineer officer proceeded upon a wrong interpretation of the contract or excluded from his calculations a factor of which the contractors were entitled to the benefit, the court will grant relief notwithstanding the provision that the decision of the engineer officer shall be final. The provision in the contract that “the decision of the engineer officer in charge as to quality and quantity shall be final” refers only to his measurement in point of fact and not to the principle Of law on which it is made, as it is the province of the court to determine the law of the contract. (Lyons v. The United States, 30 O. Cls. B>., 353,365; King Iron Bridge v. St. Louis, 43 Fed. It., 768.)
The work to be done by plaintiffs on this head required them to fill in front of Fort Brady 100,000 cubic yards of excavated material, more or less, at the rate of 13 cents per cubic yard. The entire area between the piers and the bluff on the shore was to be filled to the level of the top of the pier and the surface leveled neat and smooth. The contractors placed back of the pier 110,840 cubic yards of material. For the whole of this work the contractors were to be paid by the cubic yard measured in the bank after the filling material had been deposited back of the iner, but no payments were to be made to the contractors for the removal of any ice or snow that might form or be deposited within the area referred to in the specifications.
*333 It is assumed for tbe defendants that the shrinkage arose from the melting of the ice and snow which was deposited behind this pier along with the other material.
It does not appear how much of the excavated material deposited back of the pier in front of Fort Brady consisted of ice and snow. We are left to infer from the contentions of the defendants that whatever shrinkage there was at that point must have been caused by the melting of the ice and snow necessarily deposited there because most of this filling was done in the winter time when the earth was largely mixed with that material.
Making due allowance for the kind of material excavated in all the seasons and deposited back of the pier in the fill and excluding from the calculation the ice and snow, the usual rule prevailing among ordinary contractors in cases of shrinkage would seem to be the rule necessary to be applied where the contract is silent as to the extent of the allowance for shrinkage of the deposited material.
A considerable part of the fill was made in some 23 feet of water, but portions of the earth washed out through the cribs. The engineer estimated that over a space 1,400 feet long and 43 feet wide the fill would sink in the mud at an average depth of 1 foot, which they estimated to the contractors. This estimate was made without any examination of the bottom of the fill, and was at best but a mere guess. In this condition of affairs an accurate measurement of the number of'cubic yards indicated for payment by the contract would seem to be the number deposited according to an agreed account of the number of cars dumped and the quantity which each car held. The quantity thus ascertained by the parties was 110,840 cubic yards.
It is well settled that parties who contract on a subject-matter concerning which known usages prevail by implication incorporate them into their agreements if nothing is said to the contrary. (Robinson v. United States, 13 Wall., 366; Ohateau-gay Iron Co. v. Blake, 144 U. S. B., 476.)
It was not the continual filling of a definite space, but the cubical contents of the proper material furnished, delivered, and deposited in the area to be filled to the level of the top of the pier which afforded the criterion for the measurement. The contract provided for the payment of every cubic yard of *334 proper material so furnished, delivered, and deposited. Properly interpreted, it allows for shrinkage if the same was not the result of the deposit of ic© and snow. It can not be construed to mean that the measurement should be made immediately upon the deposit of the material, considering the time of the year when the deposit was made, without taking into the account the probability of the presence of some ice and snow. On the other hand, it does not mean that the defendant should unreasonably delay the measurement so as to exclude an allowance for the permanent shrinkage of the proper material required to be deposited. This part of the case is almost identical with that of Olarlce v. United States (6 Wall., 543), in which the Supreme Court said that where one party agrees to build an embankment for a certain sum per cubic yard, at such places as he should be directed by another, and the place selected by this other was such that there was a natural settling of the batture or foundation while the embankment was building, and a consequent waste and shrinkage of the embankment, any system of measurement which did not allow for the embankment which supplies the place of the settling is not a correct one, and if the system of measurement resorted to did not enable the engineer to compute accurately or approximately so, some other system should have been adopted.
In this case the contract provides for 100,-000 cubic yards of material at a place mentionéd. The specifications were framed on the idea'that about that number of cubic yards of material would enable the contractors to level off the surface of the top of the pier within the area described. The Government agreed to pay by the cubic yard on the estimated quantity of proper material. During the construction of the pier it was discovered that portions of the fillings had settled into the water and washed out through the cribs. When the fill was supposed to be completed the engineer was required to measure and estimate the amount of material deposited. The officer failing to do so, more material was deposited in the fill by the contractors and the surface again leveled smooth by them, as shown in the findings. It is difficult to determine with precision just how much of the material was lost by the action of the current and how much was due to natural shrinkage, but making due allowance for the kind of material necessarily deposited during the winter season and excluding the matter not properly classed *335 as earth, we find that the claimants have not been paid for 15,261 cubic yards of proper material deposited under the contract, which, at 13 cents per cubic yard, entitles them to recover the sum of $1,983.54 on this item. (Clarice’s (Jase, sufra; Lyon v. United States, 30 C. Cls. R., 353.)
The items allowed the plaintiffs aggregate $48,772.14. The third counterclaim of the defendants, amounting to $383.40, being allowed, the net amount of the allowance to the plaintiff's on their demands is $48,388.74, for which judgment will be entered.
Weldon, J., was not present when this case was heard and took no part in its decision.