Howry, J.,
delivered the opinion of the court:
Judgment was rendered for plaintiffs in this cause upon several items of a demand against the defendants arising out of an undertaking on the part of the plaintiffs to furnish the materials, labor, and appliances and do all the work for excavating a lock pit at St. Marys Falls Canal, in the State of Michigan, pursuant to a proposal of the defendants for the objects set forth. The defendants now come with a motion under and pursuant to the provisions of section 1088 of the Revised Statutes (based upon affidavits in support of the motion) for the court to grant a new trial for error in fact as to one of the findings and error of law and fact as to two of the other findings and consequent error of the “court in rendering judgment upon each of the said three findings as they appear of record in the files. (34 C. Cls. R., 294.)
The question of greatest moment arises in considering the motion upon the finding and judgment on the item for expenses incurred in keeping the lock pit free of water during the progress of the work after the defendants had neglected or refused to do the necessary pumping for that purpose. The argument is renewed with much earnestness that the word “ necessary ” in that clause of the contract which gave to the engineer in charge the right to locate the position and determine the dimensions of all necessary wells, reservoirs, and draining ditches admits of no determination as to degree by this court, but that the determination of how necessary a given well or drain might have been was left solely to the *124 judgment of the engineer, and that officer having exercised his judgment upon this point it is mot within the province of the court to revise or review the same.
By the contract the United States agreed to do the pumping required to sufficiently free the lock pit from water, and for this purpose the engineer was to locate the wells and determine the dimensions of these wells and all reservoirs and draining ditches. It then became the duty of the contractors to excavate them. The engineer neglected or refused to locate more than one well and that one was located more than 300 feet east of the east end of the pit. The water came from a direction nearly opposite and, flowing in on the excavation as the earth was taken out, the engineer was asked to free the work from the water as provided by the contract. For some inexplicable reason the officer demanded of the contractors the construction of a drainage ditch the entire length of the pit to the pumping station, 300 feet beyond. This the contractors refused to do, because compliance with the order involved the construction of a ditch some 50 feet deep most of the distance (about half of it through rock) which, when dug, could not be kept free and open in the narrow space in which blasting was necessary to make progress in excavating the rock in the pit and because of the impossibility of preventing the water in the drain from freezing in cold weather, and also because the construction of such ditch at the time the order was given would have disorganized the entire system of tracks then in place for use in the work of excavation. It would also have necessitated the gathering and employment of a much larger force, and the construction of the ditch, with the attendant difficulties incident to the collection of additional help, would have taken as much time as that necessary to be taken in excavating the pit itself in the then condition of affairs. The engineer refusing to withdraw or modify his order and neglecting to keep the pit free from water, plaintiffs were compelled to establish intermediate pumping stations and put in steam pumping apparatus of their own, and keep the pit dry with their own labor to enable them to proceed with the excavation of the material agreed to be taken out. On the trial we held that under the terms of the contract the engineer officer could not exercise an arbitrary discretion to the prejudice of the contractors in his decision as to what was *125 “necessary” and that Ms action in locating but one well at a point substantially inaccessible and at a place which imposed great and unnecessary burdens upon the contractors was a practical annulment of that provision of the contract which required him to locate the necessary number of wells to keep the pits dry and thereby enable the work to proceed to completion.
The sole provision in the contract relied on to sustain the authority of the engineer to fix, conclusive^ for the parties, the location of the wells and drains and to sustain his order for the construction of the ditch is a provision in the specifications which provided that the work must be carried on under and in conformity with the direction of the engineer in charge. It is not contended that this provision is precisely like those cases of contract which expressly declare that a decision of the engineer or other officer of all or specified matters of dispute that may arise during the excavation of the work shall be final and conclusive, as shown in Martinsburg and Potomac R. R. Co. v. Marsh (114 U. S. R.., 549) and Chicago and Santa Fe R. R. Co. v. Price (138 U. S. R., 185), so recently affirmed, and applied by a divided court, in the case of Gleason and Gosnell (not yet reported), on appeal from this court; but other authorities are offered in support of the contention along somewhat different lines, but having substantially the same effect, if they be accepted as authority for this case. They are McCulloch v. Maryland (4 Wheaton, 816); Legal Tender Case (110 U. S. R., 421); Union Pacific R. R. Co. v. United States (20 C. Cls. R., 70); Armstead v. Prop. Morris Aqueduct (47 N. J. L., 311).
Me Gulloch v. Ma/ryland was a judgment by which the power of Congress to incorporate a bank was established, notwithstanding the Constitution did not enumerate, among the powers granted, that of establishing a bank or creating a corporation.
The Legal-Tender Gase declared the constitutional power of Congress to make Treasury notes legal tender in payment of private debts in time of peace as well as in time of war.
The Union Pacific Pailroad Gase related to the liberal or restrictive meaning of the words Ct necessary expenses of opm'-ating ” a railroad under the Thurman Act of 1878.
Armstead v. Morris Aqueduct determined the extent to *126 wbieb a corporation might go to take lands under authority to condemn such lands “ as may l)e necessary for its purposes.”
The principle underlying all these cases is that, the law not being prohibited but calculated to effect some of the objects intrusted to the Government, it is not for the courts to inquire into the degree of the necessity for the existence of the law after the lawmaking power had determined the measure of the supposed necessity for action, because that would be treading on legislative ground. Thejr have no application to a matter of private contract containing mutual and dependent covenants where one of the parties alone assumes to determine the necessity for something to be done under a provision requiring a necessary thing to be done for the benefit of both. The word “necessary” as used in this contract does not import merely that which is convenient or useful. ' The necessity for a thing declared to be necessary should not be made to depend upon the mere convenience of the parties, or limited tq its mere usefulness, but upon the indispensable character of the thing stipulated for, which is the equivalent of what is reasonably necessary.
The true criterion as to the matter before the court is whether, under the language of the agreement and the facts as found, the measure of necessitjr is an open question for inquiry by the court; and if so, who shall be held responsible? We see no reason to change the views heretofore stated as to the power to revise the conduct of the parties. And as to the allowance of the item of $3,499.97 for the pumping, there seems less of possible injustice in the' judgment at this stage of the case than before, not only beause it is more apparent than ever that the United States were relieved of the expenditures incident to maintaining pumping stations and keeping the lockpit dry, but also because, in a case long since decided by this court and acquiesced in ever since, it was held that where a contract provides that the contractor shall be allowed and paid a reasonable price and compensation for his work, to be estimated and determined by a board of inspectors appointed by the Quartermaster’s Department, and the Department neglected to appoint such a board, the contractor was bound to wait only a reasonable time before bringing his action to recover for his work. (Cooper v. The United States, 8 C. Cls. K.., 199.) This principle seems eminently sound, *127 and is quite applicable to the facts in this case, because of the neglect of the engineer to do the things which under the contract the plaintiffs had a reasonable right to expect him to do.
The contract required the excavation of the necessary well:?, reservoirs, and draining ditches by the contractors, in order to have the pit free from water by the pumping undertaken to be done by the defendants. The specification on this point must be taken literally, that wells, reservoirs, and draining ditches were deemed necessary bjr the parties (that is to say, a necessary number of wells, reservoirs, and draining ditches) when the contract was made, and effect given to this apparent meaning of the parties, unless it clearly appears that one of the things contemplated was sufficient to accomplish the purpose of the agreement without injury to the party assuming to prepare the pit for pumping the water out by the other. The one well established east of the east end of the pit, for which the digging was done, being found insufficient, the contractors had the same right to have other wells, reservoirs, and draining ditches located in and around the lock pit as they would have had if but one well had been placed at a point even more inaccessible than the one located by the engineer.
That clause in the contract which provides that all materials furnished and work done, before being accepted, should be subject to a rigid inspection by an inspector to be appointed, and rejected if not in conformity with the specifications — the decision of the engineer officer in charge as to quality and quantity being final — does not relate to the-performance of the kind of work forced upon the contractors under the circumstances set forth in the finding concerning the pumping and the means used by plaintiffs to keep the lock pit dry. The right to annul the contract by notice in writing was reserved to the engineer in charge, subject to the sanction of the Chief of Engineers, upon the failure of the contractors to prosecute the work in accordance with the specifications and requirements of the contract; but this right to annul was not attempted, nor could it have rightfully been exercised, for the means taken by the contractors-to enable them to comply with the terms of their agreement after the failure of the engineer in charge to afford them the proper facilities for going on with the work.
It is no answer to the contractors’ demand for reimburse *128 ment of expenses incurred by them in this behalf to sa}- that had they complied with the order of the engineer they would have been paid for excavating- the drains and ditches when in material in siim as part of the excavation o'f the lock pit. The undertaking of an unnecessary, oppressive, and unlooked-for burden, with all the consequences of gathering an additional force, and the risks and delays incident thereto, were neither contemplated nor imposed by the contract.
The allegation that judgment was erroneously rendered upon finding twelve for the increased price of excavating frozen earth because the ground was not in a frozen condition at the time plaintiffs were required to proceed to excavate the lock pit, September 23, 1889, is founded upon a mistake as to the scope and extent of the finding and the allowance for excavating frozen earth. The finding does not allow for earth excavated and removed in a frozen condition prior to freezing weather. It contains a statement of the protest of the contractors to the officers and agents of the United States ■ against the requirement to proceed with the work of excavation after September 23, 1889, for the reason (stated by the contractors) that the ground was then frozen and the cold weather would make it impossible to operate with a steam shovel, but it does not recite that any material was removed in a frozen condition by hand prior to any given date in October. The specific date of the beginning of freezing-weather is now offered to be shown to the court by the affidavit of the official in charge of the weather bureau at Sault Ste. Marie, Mich. This does not affect the allowance Tinder the finding, as the earth taken out in a frozen condition and allowed for was estimated to be 17,509 cubic yards between freezing weather in October, 1889, and the same kind of weather in May, 1890. Mention of the specific date of the beginning of the freezing weather is therefore not material to the finding, but the same may be amended so as to fix the date of earth excavated and removed in a frozen condition at an increased cost from October 12,1889, to May, 1890 (fifteenth paragraph, finding xii).
Respecting the allegations relating to the nineteenth finding and the action of the court thereunder, there is nothing to be said except that the affidavits of the two witnesses relat *129 ing to tbe matters set up in the finding are more in the nature of argument than testimony, but so far as their statements can be considered as probable evidence the matter offered is not new, and as to these things the defendants have had their day in court.
The statements offered tending to show that plaintiffs were willing to accept a less sum than that awarded them by the judgment of the court can not be considered. The retained percentages alone amount to $21,414.79, and the offers of compromise on the other items of the demand are incompetent as evidence. Parties have a right to buy their peace if they can, and offers made without prejudice in the attempt to do so are inadmissible on grounds of public policy and can not be used to the injury of those who make them.
The motion for a new trial is overruled.
Weldon, J., was not present on the trial of this cause and took no part in its decision, nor did he take any part in the hearing or determination of this motion.